IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 06-2149-TUC-RCC(CRP) |
| Plaintiff, | |
| vs. | **REPORT AND RECOMMENDATION** |
| Eduardo Reymundo Reyna, et. al., | |
| Defendants. | |

Defendant Eduardo Reymundo Reyna (hereinafter "Defendant") filed a Motion to Suppress approximately 107 kilograms of marijuana seized by Immigration and Customs Enforcement and Tohono O'Odham Police Officers on November 30, 2006 arguing that there was no founded suspicion to stop the vehicle driven by Defendant containing such marijuana. Defendant's Motion to Suppress came on for hearing on August 30, 2007.[1]

For the reasons stated herein, the Magistrate Judge recommends that the District Court deny Defendant's Motion to Suppress.

I. PROCEDURAL AND FACTUAL HISTORY

A.    Charge

Defendant is charged with Conspiracy to Possess With Intent to Distribute on or about November 30, 2006 at or near State Route 86, Milepost 130 on the Tohono O'Odham Indian

---

[1] Although this matter is referred to the Honorable Charles R. Pyle, United States Magistrate Judge, the motion came on for hearing before the undersigned Magistrate Judge because Magistrate Judge Pyle was on leave.

1  Nation approximately 107 kilograms of marijuana in violation of 21 U.S.C. §§841(a)(1) and
2  (b)(1)(B)(vii), and 846.  (Count 1).  Defendant is also charged with knowingly and
3  intentionally Possessing With Intent to Distribute on or about November 30, 2006 at or near
4  State Route 86, Milepost 130 on the Tohono O'Odham Indian Nation approximately 107
5  kilograms of marijuana in violation of 21 U.S.C. §841(a) and (b)(1)(B)(vii).

### B.     Testimony

The Government and Defendant stipulated that on the incident date of November 30, 2006 the sun rose at 7:05 a.m. in Tucson, Arizona.  Defendant was seen driving a white truck at 7:14 a.m. eastbound on West Ajo Highway from Milepost 128.5 to Milepost 130.5 where he was stopped.

On November 30, 2006 at 7:14 a.m. Tohono O'Odham Police Officer Brian Kopcsik (hereinafter "Officer Kopcsik") was on the north side of West Ajo Highway facing west to oncoming eastbound traffic at Milepost 128.5.  (Officer Kopcsik Transcribed Testimony (hereinafter "Kopcsik p._____") pp. 7, 41).  He was monitoring vehicle speeds with use of radar.[2]  (Kopcsik p. 41).  His location at that time was a downhill curve in a hilly area. (Kopcsik pp. 7- 8).

Officer Kopcsik observed an eastbound truck pass his location with no lights on. (Kopcsik p. 8).  In his opinion, visibility was such that he would not be able to distinguish between a car or a truck a quarter mile away.  (Kopcsik p. 9)  He felt that public safety warranted having headlights on.  (Kopcsik p. 8).  His concern was with accidents occurring when it is too dark.  (Kopcsik p. 29).  The mountain range in that area affects the time of sunrise in that the sun has to rise higher to clear the mountain ridge.  (Kopcsik p. 18).

Officer Kopcsik waited for a west bound vehicle to pass before making a u-turn to proceed eastbound.  (Kopcsik p. 22).  He proceeded east bound with no other vehicles

---

[2] Officer Kopcsik has been a canine patrol officer since July 2000.  He is certified to enforce Arizona Revised Statutes as well as Tribal and Federal Statutes.  He patrols on the Tohono O'Odham Indian Nation for drug interdiction as well as traffic violations. (Kopcsik pp. 5-7).

1    between him and the white truck. (Kopcsik p. 9). Once he got two car lengths behind the
2    white truck he activated his red and blue lights and wig-wags.[3] (Kopcsik pp.41-42). The
3    white truck did not pull over and its speed fluctuated between 52 and 55 miles per hour.[4]
4    (Kopcsik pp. 9-10). When no brake lights came on, Officer Kopcsik turned on his siren.
5    (Kopcsik p. 10). Other than not stopping, no other evasive behavior occurred. (Kopcsik p.
6    23). The white truck began to slow down because of an eastbound school bus, with vehicles
7    behind it, stopping to pick up school children. (Kopcsik p. 11). Fearing for the children's
8    safety and not knowing what the driver of the white truck was going to do, Officer Kopcsik
9    started going into the westbound traffic lane to keep the white truck from going around the
10   stopped school bus and vehicles. (Kopcsik p. 11)[5]

11        Once stopped, Officer Kopcsik kept his lights and sirens on and approached the white
12   truck's driver door with duty weapon drawn. (Kopcsik p. 11). He could see a big brown
13   square package which, based on his experience and past drug seizures, contained marijuana.
14   (Kopcsik p. 12). Defendant was the driver of the white truck. (Kopcsik pp. 13-14).

15        It took Officer Kopcsik 40 seconds to position his vehicle behind the white truck.
16   (Kopcsik p. 23). The distance over which Officer Kopcsik had his emergency lights and
17   siren on was one mile and one-half. (Kopcsik p. 13).

18        C.    <u>Video Analysis</u>

19        Officer Kopcsik had a camera affixed in the cab of his vehicle that recorded his
20   pursuit of the white truck. (Kopcsik p. 18). When the emergency lights are activated the

---

[3] Pulsating high beam lights on the front of the vehicle. (Kopcsik p. 9).

[4] The speed limit on eastbound West Ajo Highway was then 55 miles per hour. It has since been increased to 65 miles per hour. (Kopcsik p. 10).

[5] Officer Kopcsik testified that by positioning his vehicle in this way it forced the white truck to stay on the southern eastbound lane of West Ajo Highway. (Kopcsik p. 11). A video shows Officer Kopcsik's vehicle following and stopping behind and to the left of the white truck.

1 camera automatically turns on. (Kopcsik p. 19). Although the camera picks up sound, it did
2 not do so on November 30, 2006. (Kopcsik p. 19).

3 A review of Officer Kopcsik's video, Government's Exhibit 1, indicates that of the
4 number of other vehicles filmed (46) the overwhelming number (39) were going westbound,
5 most of them (36) had their headlights on between 7:16:30 a.m. until 7:28:24 a.m. Of the 7
6 vehicles, including Defendant's white truck, filmed going eastbound, 4 had their lights off,
7 1had its lights on, 1 had its emergency lights flashing, and 1 either had its taillights on or the
8 driver was "riding " the brake as it passed Officer Kopcsik's and Defendant's stopped
9 vehicles.

10 The span of time during which westbound vehicles had their headlights on was from
11 7:17:12 a.m. until 7:27:50 a.m. The span of time during which westbound vehicles had their
12 headlights off was from 7:26:52 a.m. until 7:27:50 a.m. The span of time during which
13 eastbound traffic had their headlights off was from 7:19:54 a.m. until 7:27:50 a.m.

14 The distance from Tucson to Sells is approximately 70 to 75 miles. (Kopcsik p. 24).
15 It takes approximately one hour to drive from Tucson to Sells. (Kopcsik p. 25). Milepost
16 130 is the approximated half way point between Tucson and Sells. (Kopcsik p. 24).
17 Between milepost 130 and Tucson is Three Points. (Kopcsik p. 25). Anyone driving from
18 Tucson or Three Points going west on West Ajo Highway would have been driving for one
19 half hour or more leaving Tucson or Three Points between 6:30 and 6:45 a.m. (Kopcsik p.
20 26). They would have had their headlights on from that time on. (Kopcsik p. 26).
21 Depending on the weather conditions, Officer Kopcsik could distinguish a car or a truck from
22 500 feet on November 30, 2006 at 7:14 a.m.[6] (Kopcsik p. 28). Officer Kopcsik could not
23 distinguish any figures through the back window of the white truck and does not recall if it
24 was tinted. (Kopcsik pp. 29, 31).

---

[6] What is not clear from the record is whether Officer Kopcsik could discern a vehicle from 500 feet on November 30, 2006 at 7:14 a.m. with or without his own lights on.

- 4 -

## II.    LAW AND DISCUSSION

State law requires that:

> At any time from sunset to sunrise and at any other time when there is not sufficient light to render clearly discernible persons and vehicles on the highway at a distance of five hundred feet ahead, a vehicle on a highway in this state shall display lighted lamps and illuminating devices....

Ariz.Rev.Stat. § 28-922.  State law also requires that:

> ... on the immediate approach of an authorized emergency vehicle equipped with at least one lighted lamp exhibiting a red or red and blue light or lens visible under normal atmospheric conditions from a distance of five hundred feet to the front of the vehicle and that is giving an audible signal by siren, ..., the driver of another vehicle shall:
> 1. Yield the right-of-way.
> 2. Immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the roadway clear of any intersection.
> 3. Stop and remain in the position prescribed in paragraph 2 of this subsection until the authorized emergency vehicle has passed.

Ariz.Rev.Stat. §28-775. These two statutes posture the context within which Defendant was stopped.

### A.    Mistake of Law or Fact

A Government official conducting an investigatory stop of a vehicle must possess a "reasonable suspicion", i.e., a particularized and objective basis for suspecting the particular person stopped is engaged in criminal activity. *United States v. Lopez-Soto*, 205 F. 3d 1101, 1105 (9th Cir. 2000). That government official's belief when based on a mistaken understanding of the law, cannot constitute the reasonable suspicion required for a constitutional Fourth Amendment stop of a vehicle. *United States. v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000).  On the other hand, reasonable suspicion based upon a mistake of fact can furnish the grounds for a vehicle stop within the Fourth Amendment.  See *United States v. King*, 244 F.3d 736, 739 (9th Cir. 2001); *United States v. Dorais*, 241 F.3d 1124 , 1131 (9th Cir. 2001); *United States v. Garcia-Acuna*, 175 F.3d 1143 (9th Cir. 1999) (*en banc*).

Herein, the question is not whether Officer Kopcsik was mistaken as to when the law requires headlights: from sundown to sunrise at 7:05 a.m. Rather, the question is whether he was mistaken that there was not "sufficient light to render clearly discernible persons or

vehicles on the highway at a distance of five hundred feet": a question of fact and judgement. It has been recognized that:

> [t]he foremost method of enforcing traffic and vehicle safety regulations... is acting upon observed violations, (citation omitted), which afford the "'quantum of individualized suspicion'" necessary to ensure that police discretion is sufficiently constrained.

*Whren v. United States*, 517 U.S. 806, 817-818 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 654-655, 659, 661 (1979) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560 (1976)).

Based on Officer Kopcsik's background, years of experience and certification to enforce Arizona Revised Traffic Statutes, experience with traffic accidents because of the lighting conditions, and his own observations that early morning of November 30, 2006 he had sufficient reasonable and individualized suspicion to stop Defendant. Officer Kopcsik need not have

> a precise appreciation of the niceties of the law. If the *facts* are sufficient to lead an officer to reasonably believe that there was a violation, that will suffice, even if the officer is not certain about exactly what it takes to constitute a violation.

*United States v. Mariscal*, 285 F.3d 1127, 1130 (9th Cir. 2002) (citing *United States v. Wallace*, 213 F.3d 1216, 1220-21 (9th Cir.) *cert. denied*, 531 U.S. 974 (2000)) (emphasis added).

    B.    <u>Seizure of Defendant</u>

Law enforcement officers may conduct an investigatory stop only upon a:

reasonable suspicion to believe that criminal activity 'may be afoot.'"

*United States v. Arvizu,* 534 U.S. 266, 273 (2002) (*quoting United States v. Sokolow,* 490 U.S. 1, 7 (1989)). When determining whether reasonable suspicion exists, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* Such an analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them, that might well

1  elude an untrained person." *Id.* (citations omitted).   However, the inferences that officers
2  draw based upon their training and experience "must also be grounded in objective facts and
3  be capable of rational explanation." *United States v. Rojas-Millan,* 234 F.3d 464, 469 (9th Cir.
4  2000), *cert. denied,* 537 U.S. 867 (2002), (citation omitted). Importantly, the reasonable
5  suspicion "standard requires more than an officer's 'hunch,' even a hunch that later turns out
6  to be a good one." *United States v. Mattarolo,* 209 F.3d 1153, 1157 (9th Cir.), *cert. denied,*
7  531 U.S. 888 (2000), (quoting *Terry v. Ohio,* 392 U.S. 1, 27 (1968)). Whether an officer has
8  reasonable suspicion to justify a stop is a mixed question of law and fact. *United States v.*
9  *Hernandez-Alvarado,* 891 F.2d 1414, 1416 (9th Cir. 1989)

10       A police officer with probable cause may, without violating the Fourth Amendment,
11  arrest an offender he believes has committed even a very minor criminal offense in his
12  presence, *Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001), and the founded suspicion to
13  justify a vehicular stop "may take into account all of the events that occur up to the time of
14  physical apprehension of a suspect who flees." *United States v. Santamaria-Hernandez*, 968
15  F.2d 980, 983 (9th Cir. 1992).

16       The seizure or arrest of the offender:

17       requires *either* physical force...*or*, where that is absent, *submission* to the assertion of authority.
18

19  *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphasis in original). However, "[a]
20  police officer may make a seizure by a show of authority and without the use of physical
21  force, but there is no seizure without actual submission; otherwise, there is at most an
22  attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin v. California*,
23  _____ U.S. _____, 127 S. Ct. 2400, 2405 (2007) (citing *Hodari D.*, *supra*; *County of*
24  *Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)). That "show of authority" must prompt the
25  suspect to stop or yield. *Brower v. Inyo County*, 489 U.S. 593, 597 (1989) (police cars with
26  flashing lights chased suspect for 20 miles - surely an adequate "show of authority" - but he
27  did not stop until he crashed into a police-erected blockade); *see Hodari D.*, 499 U.S. at 626
28  ("The narrow question before us is whether, with respect to a show of authority as with

- 7 -

1  respect to application of physical force, a seizure occurs even though the subject does not
2  yield. We hold that it does not.").

3  Herein, Officer Kopcsik observed Defendant driving without headlights, a relative
4  minor traffic offense, in his presence. He considered the topography, environment, the then
5  existing lighting conditions, and other vehicles with lights on in pursuing Defendant. He
6  pursued Defendant for 1.5 miles utilizing overhead red and blue lights, "wig-wags" and siren
7  to get Defendant to stop. Defendant's speed fluctuated between 52 and 55 miles per hour
8  with no brake lights coming on. Officer Kopcsik "show of authority", under Arizona
9  Revised Statute §28-775 did not cause Defendant to stop. Defendant stopped because a
10 school bus had stopped to pick up school children ahead of him. Officer Kopcsik pulled in
11 behind Defendant. Defendant was not seized until Officer Kopcsik came up to Defendant's
12 driver-side window with duty weapon drawn for officer safety.

13 III.    CONCLUSION

14 Given the "totality of the circumstances": 1) Officer Kopcsik initially observing
15 Defendant driving a truck without headlights on; 2) in a lighting environment that, in Officer
16 Kopcsik's opinion, warranted headlights; 3) Officer Kopcsik then pursuing Defendant for
17 one and one-half miles with red and blue and "wig-wag" lights and siren activated; 4) with
18 no response from Defendant in either slowing down and/or break lights being observed; and
19 5) Defendant only stopping because of a school bus picking up children, Officer Kopcsik had
20 sufficient knowledge to warrant a reasonable belief that Defendant committed or was
21 committing a crime. *See Arvizu,* 534 U.S. 266.

22 IV.    RECOMMENDATION

23 For the foregoing reasons, the Magistrate Judge recommends that the District Court
24 deny Defendant's Motion to Suppress (Doc. No. 25).

25 Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal
26 Procedure, any party may serve and file written objections within ten days after being served
27 with a copy of this Report and Recommendation. If objections are filed, the parties should
28 use the following case number: **CR 06-2149-TUC-RCC.**

1    Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver
2 of the right to review.
3    DATED this 18th day of September, 2007.

_____
Héctor C. Estrada
United States Magistrate Judge